**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FLORIDA STEEL CORPORATION (TAMPA FORGE AND IRON DIVISION), Respondent.**

**No. 19145.**

United States Court of Appeals
Fifth Circuit.

Oct. 23, 1962.

**932**

Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., Stuart Rothman, Gen. Counsel, Peter Giesey, Atty., N. L. R. B., Washington, D. C., for petitioner.

L. Robert Frank, Allen, Dell, Frank & Trinkle, Tampa, Fla., for respondent.

Before CAMERON and JONES, Circuit Judges, and DeVANE, District Judge.

CAMERON, Circuit Judge.

This appeal presents one question for our determination: whether there is substantial evidence in the record as a whole to support the Board's findings that Respondent discriminatorily discharged two employees in violation of § 8(a) (3) and (1) of the National Labor Relations Act and interfered with, restrained and coerced its employees in violation of § 8(a) (1) of the Act.[1] We hold that there is not.

The question arises upon the petition of the National Labor Relations Board [2] for enforcement of its order [3] issued on June 19, 1961, against the Florida Steel Corporation. The order directs that Respondent cease and desist from discouraging union membership, interrogating employees concerning union activity, or in any other manner interfering with its employees' rights to organize. The order affirmatively requires that Respond-ent offer to rehire two employees, V. R. Mace and James Haisten and make them whole for any loss of pay suffered by reason of discrimation against them. Also included are the usual provisions for the posting of notices and notification of compliance with the order.

The Respondent manufactures and sells structural steel, iron and related products at its Tampa Forge and Iron Division and occasionally employs a second, or night shift. During July, August and September, 1959 it employed up to fifty men on the second shift because of a workload described by General Manager Lewis as the largest he could remember. Peak employment on the second shift was reached during August. Employee Haisten was hired for the second shift in early July and employee Mace was hired August 24th. On September 4th, both Mace and Haisten, along with twenty other men, were discharged. The reason for these discharges presents the controlling question in this case.

General Counsel contends (as was found by the Trial Examiner and concurred in by the Board) that the reason for the discharges was to counter union organizational activity or sympathy, and was thus discriminatory. The Board also found that Respondent violated § 8(a) (1) of the Act by offering Haisten reemployment on condition that he desist from union activity, by interrogating an employee concerning a laid-off employee's union sentiments, and by threatening economic reprisals if the plant was organized.

The Respondent contends that the men were discharged because they had been loafing and spending their time talking, and that some were not welding properly. Respondent also contends that production was not commensurate with the number of men working and that it knew nothing of any union activity in the plant,

1. 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.

2. Pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq.

3. 131 N.L.R.B. 143.

other than rumors such as were accustomed to be repeated almost every year. Respondent's Superintendent Patterson categorically denied that the discharging of any or all of the twenty-two men had anything to do with unions or union activity.

Whether there was a violation of § 8 (a) (1) by the alleged action of Libby in telling Haisten he would be reemployed on the condition he give up the union, and of A. McKenzie in questioning an employee concerning another employee's union attitude and threatening economic reprisals for organization, depends first on whether or not the men were "supervisors" within the meaning of the Act.[4] If they were not supervisors, their actions are not chargeable against Respondent. Both men were merely employees with minor supervisory duties such as those normally given a straw boss or leadman. They had no power whatsoever as is contemplated by the Act. They were workmen doing actual physical labor, just as were the rest of the men.

Further, it is clearly shown that Libby was a union sympathizer himself, later making an attempt to participate in the union organization. But even if Libby and A. McKenzie were supervisors within the meaning of the statute, we do not find substantial evidence to support the Board's findings.

■ As we must in all "substantial evidence" cases,[5] we have carefully reviewed all the evidence in the record and, assuming the responsibility "Congress has imposed on [us] * * * for assuring that the Board keeps within reasonable grounds," Universal Camera v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456, and applying the tests there laid down, and cf. N. L. R. B. v. Walton Manufacturing Co. et al. and N. L. R. B. v. Florida Citrus Canners Cooperative, 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 2d 829, we find that there is no substantial evidence, considering the record as a whole, to support the Board's conclusions.

■ We make clear the scope of our review of the Board's findings of fact: the Court of Appeals will set the Board's findings aside only where the record "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence." Universal Camera v. N. L. R. B., supra. Stated another way, such action will be taken only in a case where we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera, supra, 340 U.S. at page 488, 71 S.Ct. at page 465. We will not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." Supra at page 488, 71 S.Ct. at page 465.

From an examination of the entire record we are unable to find that the Board is supported by substantial evidence in its contention that the discharge of twenty-two men,[6] only two of whom were shown to be union adherents (and

---

4. Section 2(11) of the Act defines a supervisor as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, * * * or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

5. 29 U.S.C. § 160(e):
   "The findings of the Board with request to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

6. Of the twenty-two men discharged, eighteen worked on the night shift and twelve of the eighteen worked in the "south shop" with Mace and Haisten where the union activity was allegedly centered. Four of the eighteen on the night shift worked "on the hill" (another shop) and the other two worked in the "yard." Of

**934**

one of the two, James Haisten,[7] only to the extent of signing a union authorization card), was for the purpose of countering union activity. We quote at some length in the margin from a case very much like this on the facts, N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 5 Cir., 1961, 293 F.2d 300.[8]

■ We do not hold that it is necessary to prove that all discharged workers were union members or adherents, but at least there must be substantial proof that the mass discharge was motivated by opposition to union activity. This case is entirely different from N. L. R. B. v. Piezo Manufacturing Co., 2 Cir., 1961, 290 F.2d 455, in which eight of the nine men discharged had signed union authorization cards and such discharge affected the union's majority in the twenty-five man bargaining unit. That the burden is on the Board to prove that the discharges were discriminatory is elementary. We hold that the burden was not met in this case by the introduction of substantial evidence and the result of the Board's decision, in effect, is to put the burden of proof on the Respondent. This cannot be done.

The proof upon which the Board found that Mace and Haisten were discharged

because of Union activity was that twenty-two men were discharged about ten days after Mace was hired. The General Counsel conceded that there was no evidence that either Mace or Haisten were discharged because of their individual activities, but admitted that their rights are derived solely from the fact that they were members of the group discharged.

The positions taken by the General Counsel as to the twenty-two men is patently inconsistent. First, the Union filed charges alleging that twelve men were discriminatorily discharged, but the complaint filed by the General Counsel on behalf of the Board alleged that only two (Mace and Haisten) had been discriminatorily discharged. The Trial Examiner found that all twenty-two had been discharged to undermine union organizational activities. Then, the Examiner held that it was unnecessary to show that all of the twenty-two were union adherents or otherwise active in organizational activities, but that it was discriminatory to discharge even those who were in no manner whatsoever connected with the organizational activities. However, though it was found that all twenty-two were discriminatorily discharged, only two were ordered rehired. The Board

---

the remaining four discharged, two were on the day shift and worked "on the hill," one worked "on the hill" but his shift is unknown, and the shift and work place of the final man is unknown.

7. The Board ordered Haisten reinstated notwithstanding the fact that he was re-employed September 21, 1959 (seventeen days later), based upon its finding that his re-employment was conditioned on giving up union activity.

8. "* * * Of significance to our decision in this case is the fact that although the Examiner discussed each of the twenty-three employees mentioned in the complaint, he made no finding of discriminatory discharge as to any individual employee. Instead, the Examiner made a blanket finding that 'all employees laid off' were discriminatorily discharged, including therefore even the twenty-four who were not mentioned in the complaint. The Board adopted all the findings, conclusions, and recommendations of the Examiner, agreeing that 'Respondent's pur-

pose in making the layoffs was to retaliate' against these employees identified with the Union's organizational campaign. * * * The easy way out of making a blanket finding might be acceptable if, but only if, all or a disproportionate number of the employees had been union members or union adherents. It is wholly unacceptable when half of those discharged were not union members or engaged in union activities, and, considering only the evidence favorable to the Board's findings, a scant twenty-one were known as union sympathizers. Knowledge by an employer of the discharged employee's union activities is a vital element in the proof of a violation of Section 8(a) (3). * * * Here, where the dismissals are separate incidents and there is no evidence that the union adherents were treated more severely than others, a blanket finding evades the responsibility placed on the board and, ingenuously, attempts to evade the burden of proof the law places on the General Counsel."

affirmed on the grounds that, since only the two were mentioned in the complaint, the order should be limited to those two.

Although it may not be necessary to prove that each man discharged was a union adherent, or was connected with organizational activity, we cannot ignore entirely the failure of the General Counsel to act as to the other twenty men, when he admits that Mace's and Haisten's rights (as to the alleged § 8(a) (3) violation) depend entirely on the fact that they were members of the larger group. General Counsel's inconsistent attitude, as reflected in the findings of the Examiner and the Board, tends to buttress the conclusion that the findings were based on surmise and suspicion only, as we can find no substantial evidence in the record to support the finding that Mace and Haisten were discriminatorily discharged.

The Examiner found that Haisten's rehiring was conditioned on his abstaining from union activity, a violation of § 8(a) (1). Respondent testified that Haisten was rehired because his wife was pregnant and he needed the job and that he promised to do better work. Haisten himself testified that no mention was made of the union or union activity at the time he was rehired and this testimony is undisputed. Only Haisten and Dan McKenzie, who rehired him were present. We cannot find substantial evidence in the record that Haisten was rehired on any condition other than that he do better work.

The General Counsel bases much of his argument on statements supposedly made by Walter Libby, allegedly a supervisor, who, it is apparent to us, was a union sympathizer himself. Walter Libby did not testify and any testimony as to what Libby said, insofar as the truth of those statements is concerned, was hearsay evidence. Though perhaps such evidence is admissible under the rules of administrative practice, hearsay evidence based on statements made by a person hostile to the interests of Respondents is not very convincing.

The Board's chief witness was Mace. The Examiner's opinion of his testimony discounts greatly its probative quality. Witness the Examiner's own estimate of the weight of his testimony: "Of the General Counsel's witnesses, *Mace appeared to pattern his testimony according to what he believed necessary to prove the case.* He volunteered that the parking lot is visible from the South Shop [relevant in showing that Respondent's supervisors saw him passing out union cards], and in too pat a manner testified that he saw someone looking out of a top floor office window * * *." (Emphasis added.)

The Examiner's reasons for casting doubt on the reliability of Respondent's witnesses seemed to be limited to the opinion that he just didn't believe that a company would discharge workers when it was having production problems. "No real effort had been made to obtain improvement where it was allegedly needed, i. e., to have the men stop talking. Instead of attempting to stimulate production, the Company discharged the producers when more output was needed!"

After stating that he disbelieved the reasons given by Respondent for the discharges, the Examiner concluded that "[i]n the absence of other credible evidence and because the explanation offered is not credited or reasonably credible, the inference is warranted and I find that the discharges were motivated by the organizational activities. With rejection of the Company's explanation, the discharges are a measure of its discrimination." But the "finding of discrimination is of course limited to Mace and Haisten as alleged in the complaint." The Examiner repeatedly referred to the discharges as "unexplained."

A worker is not immune from discharge simply because he is a union member or adherent. "Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which

Section 8(a) (3) forbids." N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413. Whether the solution to the production problem was the discharging of workers not doing the work, or an employee relations program to urge them on to bigger and better things was a decision properly to be made by management, not by the Board. The Board makes much of the fact that it seems improbable that one having trouble meeting production needs would discharge a large group of employees. This is a *non sequitur*. Bad help may be worse than no help at all.

We have carefully considered the admonition of the Supreme Court in N. L. R. B. v. Walton Manufacturing Co. and N. L. R. B. v. Florida Citrus Canners Cooperative, companion cases, 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 in which the court said: "There is no place in the statutory scheme for one test of the substantiality of evidence in reinstatement cases and another test in other cases. [National] Labor [Relations] Board v. Pittsburgh S. S. Co., 340 U.S. 498 [71 S.Ct. 453, 95 L.Ed. 479], and the Universal Camera Corp. case, each decided the same day * * * state a rule for review by Courts of Appeal in all Labor Board cases." However, we do not read Walton to say that the Examiner's and Board's findings as to credibility must be accepted no matter how implausible they may be. This cannot be so, since the Board can reject the Examiner's findings, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and this Court reviews the same cold record as the Board. There is no requirement "that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve." Universal Camera Corp., supra at page 496, 71 S.Ct. at page 469.

The standard of review we have applied is that set forth in the statutes [9] and explained in Universal Camera. That standard is: whether we can "conscientiously find that the evidence supporting

that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

Enforcement denied.

JONES, Circuit Judge, concurs in the result.

---

9. § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) and § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e). The standards are the same. Universal Camera v. N. L. R. B., supra.