Philip McCAULEY, Appellant,

v.

SOUTH DAKOTA SCHOOL OF MINES
AND TECHNOLOGY, State of South
Dakota Board of Regents, Appellees.

No. 17250.

Supreme Court of South Dakota.

Argued Sept. 10, 1991.

Decided June 3, 1992.

Rehearing Denied July 9, 1992.

Dennis W. Finch of Finch Law Office, Rapid City, for appellant.

Gene Lebrun of Lynn, Jackson, Shultz & Lebrun, Rapid City, for appellees.

AMUNDSON, Justice.

Philip McCauley (McCauley) appeals the circuit court decision affirming a final order of the South Dakota Department of Labor (Department). We affirm.

## FACTS

McCauley, as an employee of South Dakota School of Mines & Technology (Tech), served as Director of the library from 1968 to 1979. He was granted tenure in 1972. In 1979, his position was changed to Associate Librarian and, at this time, McCauley became eligible to join COHE, the faculty union, and did become an active member of same. McCauley served as an officer of COHE from the spring of 1980 until the time of his dismissal. He worked under three different library Directors from 1979 to 1984: Dr. Harry Welsh, Dr. Catherine Spelts, and Dr. Bernice McKibben.

McCauley served as Associate Librarian until July 1, 1984. He then signed his appointment contract as "Reference Librarian" and served in that capacity until June 5, 1985. On that date, Tech notified McCauley by letter of its determination that just cause existed for his discharge from employment and immediately suspended him with pay. The grounds for discharge were given as (1) incompetence, (2) flagrant neglect of duty, (3) wrongful failure to comply with lawful instructions of supervisor, (4) failure to correct deficiencies in performance, and (5) failure to adhere to a constructive plan put into effect on March 8, 1985.

A conference was held on June 24, 1985, pursuant to Section 15.10 of the COHE/Board of Regents (BOR) agreement to apprise McCauley of the reasons for his discharge. On July 10, 1985, McCauley filed a grievance regarding the discharge and Tech denied it on the basis that it was untimely. McCauley then appealed Tech's dismissal of the grievance under COHE/BOR agreement and a hearing examiner was appointed by BOR. On August 2, 1985, McCauley filed an unfair labor practice charge, which alleged his dismissal was in violation of SDCL 3-18-3.1.

Pursuant to the COHE/BOR agreement, a joint hearing on the grievance and unfair labor charge was held before the hearing examiner on November 5 and 6, 1985, and on December 11, 1985, he made his recommendations to BOR. On January 15, 1986, BOR accepted the hearing examiner's recommendations and authorized Tech to proceed with McCauley's discharge. He was discharged on January 17, 1986.

McCauley subsequently appealed his July 10, 1985, grievance and unfair labor practice complaint to Department, and filed an additional grievance on February 16, 1986. BOR and Tech filed responsive pleadings to all grievances and unfair labor practice claims filed by McCauley. Both grievances and the unfair labor practice complaint were combined for hearing before Department. The hearing was held by Department September 14-18, 1987. Department issued a decision upholding McCauley's discharge on April 5, 1989. Department found Tech and BOR had "just cause" for dismissal and that there was no unfair labor practice by Tech. It also found, with regard to the grievance filed in February, 1986, that McCauley was not

entitled to remain on payroll pending the exhaustion of his appeals.

McCauley appealed Department's decision to circuit court. The circuit court affirmed Department's decision in all respects.

## ISSUES

1. Whether Department and circuit court erred in failing to find an unfair labor practice on the part of Tech and BOR in dismissing McCauley from his tenured position with Tech?
2. Whether Department and circuit court erred in not finding a violation of the collective bargaining agreement between COHE/BOR in dismissing McCauley from his position at Tech?
3. Whether Department and circuit court erred in failing to interpret the COHE/BOR collective bargaining agreement to allow McCauley continued pay during the pendency of his appeals?

## ANALYSIS

*Standard of Review*

 This court reviews the record of administrative agencies in the same manner as the circuit court. SDCL 1–26–37; *Appeal of Hendrickson's Health Care,* 462 N.W.2d 655 (S.D.1990); *Peery v. Department of Agriculture,* 402 N.W.2d 695 (S.D. 1987); *In Matter of Application of Northwestern Bell Tel. Co.,* 382 N.W.2d 413 (S.D. 1986). Since the circuit court affirmed Department's findings of fact and conclusions of law in their entirety, our review is of the agency's findings and conclusions. *Matter of Midwest Motor Exp., Inc., Bismarck,* 431 N.W.2d 160 (S.D.1988).

 Conclusions of law are given no deference on appeal and are freely reviewable. SDCL 1–26–36; *Hendrickson's,* 462 N.W.2d at 656; *Karras v. State, Dept. of*

*Revenue,* 441 N.W.2d 678 (S.D.1989); *Sharp v. Sharp,* 422 N.W.2d 443 (S.D. 1988). Questions of fact, however, are given greater deference. SDCL 1–26–36. This court does not substitute its judgment for Department's on the weight of evidence pertaining to questions of fact unless Department's decision is clearly erroneous, or is arbitrary, capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. *Finck v. Northwest School Dist. No. 52–3,* 417 N.W.2d 875 (S.D.1988); *Permann v. Dept. of Labor, Unemp. Ins. D.,* 411 N.W.2d 113 (S.D.1987); *Appeal of Templeton,* 403 N.W.2d 398 (S.D.1987); *Anderson v. Western Dakota Insurors,* 393 N.W.2d 87 (S.D. 1986). We will not reverse an agency decision unless we are left with a definite and firm conviction that a mistake has been committed. *Finck,* 417 N.W.2d at 878; *Matter of Midwest,* 431 N.W.2d at 162; *Dakota Harvestore v. S.D. Dept. of Revenue,* 331 N.W.2d 828 (S.D.1983); *Fraser v. Water Rights Commission, Etc.,* 294 N.W.2d 784 (S.D.1980). With these standards of review in mind, we address Department's findings and conclusions.

## (1) Unfair Labor Practice

McCauley argues that Department made a clear mistake in its analysis of Tech's actions toward him. He alleges that the evidence clearly shows his discharge was a result of his union activities and therefore a violation of SDCL 3–18–3.1.[1]

In *General Drivers & Helpers U. v. Brown Cty.,* 269 N.W.2d 795 (S.D.1978), this court set forth guidelines for making a determination as to whether a discharge was in violation of SDCL 3–18–3.1. Department discussed each of the applicable *General Drivers* guidelines individually in its decision and made twenty findings of fact on this issue alone. The hearing ex-

---

1. Specifically, McCauley claims violations of SDCL 3–18–3.1(1) and (4) which read:
 It shall be an unfair labor practice for a public employer to:
 (1) Interfere with, restrain or coerce employees in the exercise of rights guaranteed by law; and

 . . . .
 (4) Discharge or otherwise discriminate against an employee because he has filed a complaint, affidavit, petition or given any information or testimony under this chapter.

aminer's findings on these guidelines were generally as follows:

(1) *Whether employee had been criticized or specifically warned of his shortcomings:* McCauley had been criticized and specifically warned of his shortcomings on numerous occasions by each of the Directors Welsh, Spelts, and McKibben during their respective terms as director.

(2) *Whether employee was given any advance notice of his discharge:* McCauley received notice of intent to discharge on June 5, 1985, and was not formally discharged until January 17, 1986. Dr. McKibben had recommended as early as October, 1984, and again on May 13, 1985, that McCauley be discharged. He was also evaluated as unsatisfactory in 14 of 17 categories for the period of March 1, 1984, to February 6, 1985. All of these events establish that McCauley was given sufficient notice of discharge.

(3) *Whether employer offered economic benefits if employee would refrain from union activity:* This guideline was irrelevant. No allegations were made that anyone from Tech or the BOR ever offered any economic benefit to McCauley if he would not join the union or would refrain from union activity.

(4) *Whether employer was opposed to unionization:* Dr. Schleusener, then President of Tech, and Dr. Orava, who was the acting Vice President of Tech, both made statements which indicated they were less than enthralled with having to deal with the union.

(5) *Whether employee was competent:* McCauley was not competent in performing the particular duties which were assigned to him based upon the evidence presented to the hearing officer.

(6) *Whether employee was a known leader of unionization drive and employer knew of employee's union activity at the time of discharge:* While it is not clear whether Dr. Schleusener knew McCauley was an *officer* at the time of the discharge, he was certainly aware of McCauley's activity in the union at the time of the discharge. Thus the record sufficiently established that Tech and Dr. Schleusener were aware of McCauley's activity in the union at the time of his discharge.

(7) *Whether the discharge plan was promulgated with speed:* McCauley argued that his discharge plan was promulgated with speed and relied on a June 3, 1985, memo from Dr. Orava to Dr. Schleusener which made disparaging comments about unions. McCauley was discharged on June 5, 1985. The record, however, fails to support McCauley's inference that the decision to implement his discharge plan was based on the contents of the June 3, 1985, memo. The record does not support a finding that the discharge plan was based on any improper motive on the part of Tech.

(8) *Whether employer gave an implausible explanation for its action:* Tech stated the grounds for dismissing McCauley as incompetence, flagrant neglect of duty, wrongful failure to comply with lawful instructions of a supervisor, and insubordination.[2] The hearing exam-

2. Tech provided the following examples to support these grounds:

A) Failure to prepare workable schedules for either Acting Director Spelts or Director McKibben.
B) Failure to keep current on current library procedures and technologies.
 i. Refused or failed to learn computer skills needed for literature searching.
 ii. Did not keep up with terminal passwords.
 iii. Did not learn the concept of telephone modem for computer terminals.
 iv. Suggested unworkable classifications for library.

C) Provided erroneous information on interlibrary loan return time.
D) Inability or refusal to coordinate schedules and leave time with supervisors and other staff personnel.
E) Inability or refusal to fulfill patrons basic literature searching needs in a timely manner.
F) Provided improper and inadequate training for new employees.
G) Failure, as Reference Librarian, to be readily available to serve the patrons of the library.
H) Inability or refusal to cooperate and to interact with supervisors and other staff personnel.

iner found that the stated grounds and supporting examples were sufficient to provide a plausible explanation for Tech's decision to discharge.

(9) *Whether the discharged employee was singled out for special treatment:* The record as a whole does not indicate that McCauley was singled out for special treatment by Tech because of his union activities.

(10) *Whether the reasons for discharge given at the hearing were the same as those given the employee at the time of discharge:* The record sufficiently establishes that the reasons for discharge given at the Department hearing as well as the reasons given at the BOR hearing on December 7, 1985, were the same reasons given McCauley at the time of his discharge.

Department was to determine if there was substantial evidence indicating McCauley's "union activity" weighed more heavily in the decision to fire him than did Tech's dissatisfaction with his performance. If there was such evidence, then the decision of Tech and the ruling of the hearing examiner for the BOR were to be reversed. *General Drivers,* 269 N.W.2d at 801.

█ Department found there was testimony which made it apparent the President at Tech was not enchanted with unions, but found no evidence that such aversion on his part impacted the manner in which McCauley's grievances were handled. It also found that although Tech knew of McCauley's membership in the union, there was no evidence that this was the basis for their determination to discharge McCauley. Based on its consideration of the evidence presented, Department concluded that McCauley had completely failed to estab-

lish that anti-union animus motivated his discharge.

McCauley also alleged that Dr. McKibben manufactured documents and information after he was fired to support Tech's decision to fire him. Our review of the record reveals that McKibben prepared notebooks which organized previously existing documents and information into a manageable fashion for the hearing examiner and trial court. The record reflects McKibben did not prepare all of the documents to substantiate Tech's decision to fire McCauley, she merely placed the documents in indexed notebooks to assist the trial court and hearing examiner in wading through the voluminous record.[3] Thus, McCauley's allegation that McKibben manufactured the evidence fails.

Our review of the record, particularly the hearing examiner's general findings set forth above, reveals extensive evidence pertaining to McCauley's misconduct and incompetence as Reference Librarian. Accordingly, we do not believe the result reached by Department is clearly erroneous, nor are we left with a definite and firm conviction that a mistake has been committed. We affirm the circuit court's and Department's decision that no unfair labor practice existed on the part of Tech and BOR in dismissing McCauley.

### (2) Collective Bargaining Agreement

McCauley argues that Department erred in finding "just cause" existed for his dismissal, and that this finding violates the COHE/BOR collective bargaining agreement.

The COHE/BOR collective bargaining agreement sets forth a definition of "just cause" which includes gross immorality, in-

---

I) Failure to fulfill job description as Reference Librarian.

**3.** Relevant portions of McKibben's testimony regarding the preparation of the notebooks are as follows:

Q [by Mr. Lebrun]: We have, in the room here with us, six notebooks.... You're familiar with those notebooks?
A [McKibben]: Yes, I am.
Q: Did you prepare them?

A: I prepared them; my secretary and I, uh huh.
Q: At whose request?
A: Dr. Schleusener's.
Q: And what did you attempt to do in the preparation of these six notebooks?
A: In the preparation of those six notebooks, *I attempted to go back through all of the documentation, and under each of the allegations, to put the supporting evidence.* (Emphasis added.)

competence, and flagrant neglect of duty. In Tech's June 5, 1985, letter to McCauley, it set out the grounds for its determination that "just cause" existed for McCauley's discharge. As stated above, those grounds were (1) incompetence, (2) flagrant neglect of duty, (3) wrongful failure to comply with lawful instructions of a supervisor, (4) failure to correct deficiencies in performance; and (5) failure to adhere to a constructive plan put into effect on March 18, 1985.

■ Department considered the evidence and entered specific findings for "just cause" regarding McCauley's lack of necessary skills to perform his job, lack of interest or ability to gain the necessary skills to perform his job, inability to cooperate and interact with his supervisors and other personnel, failure to complete tasks he was asked or required to do by job description, and the demoralizing effect which his uncooperative conduct had on other staff members.

Department stated that the testimony of all three Directors adequately showed McCauley was unable to or refused to cooperate with supervisors and other staff members. Department also found there were many situations where McCauley pitted his judgment against that of his supervisors, and failed to complete many tasks he was asked or required to do. Department found that these instances individually might seem insignificant but, taken as a whole, they established a pattern of neglecting duty. Further, Department found the testimony of Directors Welsh, Spelts, and McKibben sufficiently established McCauley's incompetence, flagrant neglect of duty, and insubordination as contemplated by the COHE/BOR agreement.

Department heard the testimony, observed the witnesses, and examined the multitude of exhibits. Giving the appropriate deference to the findings made and inferences drawn by Department on such questions of fact, we find the record to be replete with examples of McCauley's conduct to support Department's findings on the matter of just cause, and not, therefore, clearly erroneous. *Cunningham v. Yankton Clinic, P.A.,* 262 N.W.2d 508

(S.D.1978); *Peery v. Department of Agriculture,* 402 N.W.2d 695 (S.D.1987).

McCauley also argues he was not allowed to complete his constructive plan prior to his termination, as is mandated by the COHE/BOR agreement. He further argues he was entitled to implementation of at least two constructive plans before he could be considered for termination.

The specific language regarding constructive plans at § 9.20(5) of the COHE/BOR agreement is in pertinent part as follows:

If the [performance] evaluation identifies deficiencies in performance of assigned duties that are considered serious by the supervisor(s), the administration will develop a prescriptive plan to remedy the faculty unit member's deficiencies.... If the faculty unit member fails to correct the serious deficiencies identified in the prescriptive plan, the faculty unit member may be subject to action pursuant to Article 15 [Discharge and other discipline].

■ As we read the agreement, there is no specific time requirement provided in the plan. McCauley had been under his plan for approximately two months, during which time the evidence disclosed he made no effort to comply with its terms. After two months with no efforts or results from McCauley, Tech proceeded to discharge him. The terms of the agreement state only "if [he] fails to correct the serious deficiencies identified in the prescriptive plan[.]" Thus, after McCauley completely disregarded the plan for the two months it was in place, we find nothing in the agreement that prohibits Tech/BOR from electing to discharge the employee prior to the plan having run its full course. While the plan is in effect, it can easily be discerned whether the deficiencies are being corrected or there is a good faith effort to cure same, which was obviously not the case here. Tech reasonably concluded he was failing to correct the deficiencies or was not putting forth a good-faith effort to correct the deficiencies.

McCauley mistakenly argues he was entitled to implementation of at least two con-

structive plans prior to his termination. The language upon which he relies is within the COHE/BOR agreement as Board Policy 5/4/3(10) and reads as follows:

> 5/4/3 *Discharge for Cause and Other Discipline*
>
> "Just cause" shall be deemed to include:
>
> (10) More than twice subjected to a constructive plan, under 9.20, Subsection 5 of this Agreement, within a five (5) year period.

Again, we do not read this to say a professor is entitled to implementation of two plans prior to termination. Instead, a fair reading is that if a professor has been subjected to more than two constructive plans within five years, there exists just cause for dismissal.

■ Other courts have observed that a college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the administration. *Watts v. Board of Curators, University of Missouri,* 495 F.2d 384, 389 (8th Cir.1974); *Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir.1973), *cert. denied* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695; *Duke v. North Texas State University,* 469 F.2d 829, 840 (5th Cir.1973), *cert. denied* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160; *Stastny v. Board of Trustees, Etc.,* 32 Wash.App. 239, 647 P.2d 496, 504 (1982), *cert. denied* 460 U.S. 1071, 103 S.Ct. 1528, 75 L.Ed.2d 950. The record reflects the administration at Tech and the BOR gave McCauley numerous opportunities to work cooperatively with them, and McCauley refused. Department weighed all the evidence and found it supported the action of Tech and BOR in discharging McCauley. We will not substitute our judgment for that of Tech, BOR, or Department. *Peery,* 402 N.W.2d at 697. Accordingly, we af-

firm the circuit court's holding that just cause existed for McCauley's discharge.

*(3) Continued Pay*

McCauley argues that Tech and BOR violated procedural requirements of the collective bargaining agreement by terminating and removing him from the payroll before he had exhausted all his appeals. This issue requires interpretation of the language in the agreement, and is therefore a question of law and fully reviewable by this court. The agreement provides, in pertinent part:

> The administration, however, will not proceed with formal action to discharge until the faculty unit member has, through delay or other clear expression, indicated the intention to waive the right to Article 6.00, Grievance Procedure, or until the provisions of that article have been exhausted.... The administration may suspend a faculty unit member with pay pending final action to discharge if in the administration's judgment the character of the charges warrants such action.

Article 6.00, the grievance procedure, provides for a three-step process. McCauley argues that part of this process includes appeals under SDCL 3–18–15.2 [4] and, therefore, final action to discharge and remove him from the payroll must await exhaustion of his appeals from the BOR decision at least through the administrative and judicial system and perhaps through the judicial system as well. We disagree.

Were it not for the final action of BOR to discharge McCauley, he would have no basis for an appeal; there would be no final order or action from which to take appeal. We also note McCauley's grievance regarding his discharge went the full three steps of the grievance procedure under Article

---

**4.** SDCL 3–18–15.2 provides:

> If, after following the grievance procedure enacted by the governing body, the grievance remains unresolved, except in cases provided for in § 3–6A–38, it may be appealed to the department of labor, if notice of appeal is filed with the department within thirty days after the final decision by the governing body is mailed or delivered to the employee. The department of labor shall conduct an investigation and hearing and shall issue an order covering the points raised, which order is binding on the employees and the governmental agency. Nothing in this section may be interpreted as giving the department of labor power to grant tenure or promotion to a faculty member employed by the board of regents.

6.00 of the COHE/BOR agreement before the BOR took final action to discharge him.

We have not specifically ruled on the issue of whether or not the appellate procedure includes administrative and judicial appeals under the COHE/BOR agreement. In *Beville v. Univ. of S.D./Bd. of Regents*, 420 N.W.2d 9, 12 (S.D.1988), however, we stated: *"After the grievance procedure is exhausted*, SDCL 3–18–15.2 allows appeals to be made to the Department of Labor." (Emphasis added.)

 We did not find in *Beville* that appeals to Department were part of the grievance procedure, and we decline to so find here. To do so would require institutions of higher education in this state to continue to pay terminated employees for the months or years they could potentially keep their appeals alive. This conclusion is not supported by statute, case law, or the COHE/BOR agreement.

Accordingly, we affirm the circuit court decision that McCauley was properly terminated from Tech's payroll by final action of the BOR, McCauley's formal discharge.

MILLER, C.J., and WUEST, J., concur.

HENDERSON and SABERS, JJ., dissent.

HENDERSON, Justice (dissenting).

*Time Table*

- McCauley becomes Director of the Library at the School of Mines on October 1, 1968.
- After nearly 17 years of service, McCauley receives an unfavorable formal evaluation in February, 1985. It is the first one—ever.
- McCauley is then given a prescriptive plan to improve his alleged deficiencies by June 30, 1985. It heavily emphasizes computer literature searching skills.
- On June 3, 1985, he was given a reprimand; on June 5, 1985, he was notified that he would be discharged for cause. He was immediately suspended *with pay*.
- The prescriptive plan aforesaid was not in effect for the full two months; thus,

Professor McCauley was not given the time prescribed.

- On July 10, 1985, McCauley commenced grievance procedures per Article 6 of a collective bargaining agreement. McCauley also filed unfair labor practice charges. On August 2, 1985, McCauley filed a grievance alleging that his dismissal was related to his activities as a union member and union official.
- After hearings, the School of Mines discharged McCauley on January 17, 1986, whereupon his pay ceased.
- Under Article 6 of the collective bargaining agreement, McCauley appealed to the Department of Labor of South Dakota on February 16, 1986, which held against him.
- A totally different grievance was also filed by McCauley in January, 1985, urging that his salary could not be terminated until he exhausted all of his appeal rights to said Department of Labor, pursuant to Article 6 of the collective bargaining agreement.
- SUMMARY: There are, therefore, two grievances and one unfair labor practice filed, all of which were combined into one hearing by the Department of Labor of this state; they are also combined in the present appeal.

This Court will not substitute its judgment for the Department's on the weight of evidence regarding questions of fact unless we find that decision to be clearly erroneous, or arbitrary, capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. We will not disturb the findings of the Department unless we are left with a definite and firm conviction that a mistake has been made. *Finck v. Northwest School District # 52–3*, 417 N.W.2d 875 (S.D.1988). In this case, a mistake has been made.

*Reversible Error*

McCauley was dismissed from his tenured position by virtue of an unfair labor practice, namely: Termination resulting from union activities. The evidentiary record bears this out. McCauley alleges that his dismissal violated SDCL 3–18–3.1

(quoted by majority). The most relevant case dealing with this statute and these issues is *General Drivers and Helpers Union v. Brown County*, 269 N.W.2d 795 (S.D.1978). As the majority discusses, *General Drivers* sets forth guidelines to determine whether a discharge was in violation of SDCL 3–18–3.1. The following discussion highlights violations of the guidelines as pertinent to the facts.

(1) Initially, I disagree with the majority that McCauley had received adequate criticisms or warnings. His very first formal unfavorable evaluation came in February, 1985, just prior to his dismissal. This evidence is absolutely uncontroverted.

(2) McCauley was not given sufficient advance notice of his impending termination. The prescriptive requirements had not been met in regard to this tenured faculty member prior to termination. The School of Mines gave him a prescriptive plan to improve his deficiencies by June 30, 1985; notwithstanding, he was discharged on or about June 5, 1985. These two salient facts are also uncontroverted.

(3) Department of Labor made a specific finding that the School of Mines was opposed to unionization. Open hostility to unions was demonstrated by smoking gun memos discovered during the course of this litigation. The President of the School of Mines and Dr. Orava, who was in a supervisory capacity over grievances filed by Professors/Instructors, made statements that were clearly hostile to the union. Dr. Orava made reference to "incompetence," fostered by unions in an office memo to Dr. Schleusener dated June 3, 1985. This memo specifically stated, inter alia, "lets perpetuate incompetence! Isn't that what unions are for?" McCauley received notice of intent to discharge two days after this memo was circulated and other adverse comments were made. President Schleusener admitted during the hearings herein that he had an intense personal dislike for unions. In determining whether such a discharge is unlawful, the entire course of conduct of an employer should be considered. *NLRB v. Vail Mfg. Co.*, 158 F.2d 664 (7th Cir.1947). Evidence of an employ-er's hostility toward the union is one of the primary elements in reviewing the employer's course of conduct. *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 72–73 (3rd Cir.1942).

(4) From all indications, McCauley was, in fact, a competent employee. This is bolstered by the fact there was no unfavorable evaluation until shortly prior to termination. Reason dictates that if he were truly a bad professor or employee that, over a course of 17 years he would have been notified formally of his alleged deficiencies or would have received notice of termination. His sole substantiated complaint against McCauley toward all his duties was his alleged inability to perform computer literature searches. He was also alleged to have filed too many grievances. An employee cannot be discharged for filing grievances; it is a per se unfair labor practice for an employer to do so. *John Klann Moving and Trucking Co. v. NLRB*, 411 F.2d 261 (6th Cir.1969). *See*, SDCL 3–18–3.1(4) which defines an unfair labor practice as a "[D]ischarge ... against an employee because he has filed a complaint ..." So South Dakota law protects professors who file grievances. It is to be remembered that the South Dakota School of Mines bought into this collective bargaining agreement. Thus, it must live by it and our state statutes.

(5) While there existed no unionization drive ongoing, McCauley was a known proponent and officer of the union. Dr. Schleusener, President of the School, knew of McCauley's union activity. The Department of Labor made specific findings that this knowledge was present at the time of termination. An employer may not discharge an employee based partly on business reasons if a part of that decision is based on the employee's union activities. *NLRB v. Park Edge Sheridan Meats, Inc.*, 341 F.2d 725 (2nd Cir.1965); *NLRB v. West Side Carpet Cleaning Co.*, 329 F.2d 758 (6th Cir.1964).

(6) School of Mines has given an implausible explanation for the termination. While some legitimate business reasons may have been present, the overwhelming

weight of the evidence points to termination due to anti-union animus. " '... the fact that a lawful cause for discharge is available is no defense where the employee is *actually* discharged because of his Union activities.' " *General Drivers*, 269 N.W.2d at 799 (quoting *N.L.R.B. v. Ace Comb. Co.*, 342 F.2d 841, 847 (8th Cir. 1965)). At the highest echelon, School of Mines' officials openly deplored unionization. Again, it is noted that the School of Mines did enter into a collective bargaining agreement.

McCauley was dismissed from his position wrongfully because of or through a violation of the collective bargaining agreement. The collective bargaining agreement set out 14 specific criteria which constitutes "just cause." However, the School of Mines, in its letter notifying McCauley that "just cause" existed for termination, only set out two charges which fell within the 14 criteria for "just cause." These were (1) "wrongful failure to comply with lawful instructions of a supervisor" and (2) "failure to adhere to a constructive plan put into effect on March 18, 1985." From a review of the record, no evidence exists to support this first charge. The Department of Labor made no specific finding on this issue, and only cursorily referred to it. It is important to note also that School of Mines did not give McCauley the full time period to complete the constructive plan. Thus, the two allegations against McCauley fall. Nor does it seem that the length of time originally allotted to complete the plan was time enough to complete the requirements of the plan.

School of Mines discharged McCauley pursuant to Section 15.10 of the collective bargaining agreement. McCauley was suspended with pay as authorized by 15.10. McCauley proceeded to appeal pursuant to Article 6, Grievance Procedure. Article 6 authorizes appeals to the South Dakota Department of Labor. SDCL 3–18–15.2 specifically allows appeals to the Department of Labor if no resolution of the grievance is resolved through the grievance procedure. *See, International Union of Operating Eng'rs Local #49 ex rel. Maack v. Aberdeen School Dist.*, 463 N.W.2d 843 (S.D.

1990) (Notices of appeal should be liberally construed in favor of their sufficiency.) Additionally, Section 15.10 fixes the burden to prove "just cause" on the employer and, more importantly, prohibits final action against a tenured faculty member prior to exhaustion of all Article 6 provisions. When final action to terminate McCauley occurred on January 17, 1986, McCauley had neither exhausted all of his Article 6 rights nor made a clear expression of his desire to waive his rights. Thus, per the express terms of the bargaining agreement, McCauley was prematurely terminated. Assuming arguendo that McCauley was properly discharged for "just cause," he is nevertheless entitled to a fair hearing below on the amount of pay he is entitled to until he exhausted all of his rights under the labor agreement by which he, and all faculty, were employed. *See generally, Kierstead v. Rapid City*, 248 N.W.2d 363 (S.D.1976) (employee entitled to reinstatement and back pay since Department of Labor director lacked specific statutory authority to hear and determine the grievance presented).

Under the state of this record, I am not comfortable in joining the majority opinion. As I review this case, I am overwhelmed that this man gave 17 years of his life to the South Dakota School of Mines and Technology and was terminated before he had a chance to improve himself in computer searching skills. Tenure is a precious right for a college professor. His tenure was foreshadowed by a mind set against unions. Such a mind set should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. Our courts exist, not to deny relief to those who have been injured, but, on the contrary, to fulfill their obligation to make themselves available to litigants who have been deprived of their rights. Courts exist as a haven for those who seek fair dealing. This professor is entitled to the protection of his tenure and the bargaining agreement.

SABERS, Justice (dissenting).

Although Tech "agreed" to rehabilitate McCauley through a "prescriptive plan" *if*

it had a problem with his performance, Tech discharged him before the time for his improvement expired on the first prescriptive plan. Therefore, I agree with the dissent that Tech failed to follow proper statutory and negotiated procedures and we should reverse and remand for that purpose.